# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | | |
|---|---|---|
| Companion Property and<br>Casualty Insurance Company (n/k/a<br>Sussex Insurance Company),<br><br>    Plaintiff,<br>v.<br><br>U.S. Bank National Association,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 3:15-cv-01300-JMC<br><br><br><br>**ORDER AND OPINION** |
| U.S. Bank National Association,<br><br>    Third-Party Plaintiff,<br>v.<br><br>Redwood Reinsurance SPC, Ltd.;<br>Southport Specialty Finance;<br>Southport Lane Advisers;<br>Administrative Agency Services;<br>Alexander Chatfield Burns; and<br>Aon Insurance Managers (Cayman) Ltd.,<br><br>    Third-Party Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Alexander Chatfield Burns,<br><br>    Fourth-Party Plaintiff,<br>v.<br><br>U.S. Bank Trust National Association,<br><br>    Fourth-Party Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |

This case concerns which party or parties should bear the loss of value in trust accounts that served as security for a reinsurance program occasioned by the substitution into the trust accounts of allegedly worthless and otherwise defective assets. In separately filed motions to

dismiss the complaints against them (ECF Nos. 171, 192), Third-Party Defendant Aon Insurance Managers (Cayman) Ltd. ("Aon") and Fourth-Party Defendant U.S. Bank Trust National Association ("USBT") challenge, among other things, the court's personal jurisdiction over them in this matter, pursuant to Fed. R. Civ. P. 12(b)(2). For the reasons that follow, the court concludes that Aon and USBT are not subject to the court's personal jurisdiction, **GRANTS** their motions to dismiss, and **DISMISSES** the complaints against them.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[1]

Companion Property and Casualty Insurance Company ("Companion") participated in a fronted insurance program (the "Program") with Redwood Reinsurance SPC, Ltd. ("Redwood") and Dallas National Insurance Company ("Freestone"), two reinsurance companies. In a fronted insurance program, the reinsurer—here, Redwood and Freestone—bears the actual risk of program performance. The insurance company—here, Companion—receives a fee for allowing its name and paper to be used as the front. As part of the Program, reinsurance collateral trusts established for Companion's benefit under the reinsurance agreements secured Redwood's and Freestone's reinsurance obligations to Companion.

U.S. Bank National Association ("U.S. Bank")[2] was substituted as a successor trustee on Companion's reinsurance trust agreements with Redwood and Freestone under two separate trust agreements, the Redwood Trust Agreement and the Freestone Trust Agreement (collectively the

---

[1] A fuller account of the background of this case may be found in the court's orders disposing of previously filed motions to dismiss. (*See* ECF Nos. 41, 118, 268.) For purposes of the instant motion, a somewhat abridged version of the facts as set forth in those orders will suffice. Accordingly, the court directs interested readers to its previous orders and will forego reference to the record except where the court quotes from the record, where the court refers to facts beyond those set forth in the previous orders, or where reference would be particularly useful.

[2] U.S. Bank and USBT, though affiliated, are separate entities.

2

"Trust Agreements"). The Trust Agreements named Redwood and Freestone, respectively, as grantors, U.S. Bank as trustee, and Companion as beneficiary. Under the terms of the Trust Agreements, "[Redwood or Freestone] may direct [U.S. Bank] to substitute Assets of comparable value for other Assets presently held in the Trust Account[s] with written notification to [Companion] of the substitute Assets. [U.S. Bank] shall comply with any such direction." (ECF No. 50-2 § 4(c).) Under the Trust Agreements, Redwood and Freestone promised that the assets: (1) consisted only of "Eligible Securities" as defined by contract; (2) were in such form that Companion could transfer and dispose of any assets without the consent of anyone else; and (3) at all times had a value sufficient to cover 125% of Redwood's and Freestone's respective reinsurance obligations.

According to U.S. Bank's pleadings, Alexander Chatfield Burns ("Burns") founded a number of corporate entities, to which U.S. Bank refers collectively as "Southport,"[3] which acquired Redwood in 2012 and Freestone in 2013. U.S. Bank alleges that Southport Lane Advisors ("SLA"), named as a third-party defendant, managed the asset allocation strategies, such as determining which assets to buy and sell and in what amounts, for all of the Southport companies, including Redwood and Freestone. U.S. Bank asserts that Burns was, at all times relevant to this action, Southport's beneficial owner, controlling person, and chief strategist, essentially treating SLA and other Southport entities, including Redwood and Freestone, as his alter egos.

On March 20, 2015, Companion filed a complaint in this court against U.S. Bank, alleging that, between May 2013 and January 2014, U.S. Bank, as trustee, approved and permitted the substitution of assets for various investments for the Freestone and Redwood trust accounts. Companion asserts that U.S. Bank is liable for these substitutions because certain assets in the trust

---

[3] In its third-party complaint, U.S. Bank uses "Southport" to refer collectively to Southport Lane, LP; Southport Lane Management, LLC; Southport Lane Genesis, LP; SLI Holdings, Inc.; and Southport Lane Financial, Inc. and their respective subsidiaries and affiliates.

accounts violated the terms of the Trust Agreements. Specifically, Companion alleges that certain Southport affiliate securities held in the trust accounts were not "Eligible Securities" under the Trust Agreements, were not freely negotiable, and/or had little to no value. Companion makes these same allegations with regard to the acquisition of Destra Targeted Income Unit Investment Trust ("Destra UITs") units for the trust accounts.

On January 29, 2016, U.S. Bank filed an initial third-party complaint against Redwood, several Southport entities, Administrative Agency Services, and Burns. Although U.S. Bank denies Companion's claims, it argues that, if Companion's allegations are proven at trial, Third-Party Defendants, including Burns, are liable to Companion. First, U.S. Bank alleges Redwood and Freestone—either directly or through SLA—directed U.S. Bank's purchases of securities and other membership interests in various companies and that SLA falsely represented the values of the securities to be purchased. Second, U.S. Bank alleges that Redwood and Freestone caused the Redwood and Freestone trust accounts to acquire Destra UIT units from June 2013 through January 2014. As with the securities and ownership interests, U.S. Bank alleges Redwood and Freestone directed its purchases of units in the Destra UITs—directly or through SLA—from June 2013 through January 2014 and falsely represented the values of the units to be purchased. With respect to Burns, U.S. Bank alleges that he dominated and controlled Redwood, Freestone, and the Southport entities and directed or participated in all of the relevant conduct. Redwood, the Southport entities, Administrative Agency Services, and Burns all moved to dismiss the third-party complaint, and the court dismissed all claims as to those parties except for U.S. Bank's claim for contribution.

On June 10, 2016, following the previous order partially dismissing its initial third-party complaint, U.S. Bank filed an amended third-party complaint, this time including Aon as a

defendant to its renewed contribution claim. (ECF No. 131 at 1, 5, 35-37.) U.S. Bank alleges that, when Southport acquired Redwood, Burns was appointed as Redwood's director, and Aon was appointed as its corporate secretary and, "as corporate secretary[,] signed the Redwood Trust Agreement." (*Id.* at 11, 14-15.) Aon was "identified as [an] authorized signer[] on the Redwood Trust Account," which authorized it "on [Redwood's] behalf to direct U.S. Bank to take action" regarding the trust account. (*Id.* at 18.) Aon also, "[a]s Redwood's [c]orporate [s]ecretary," signed an investment management agreement between SLA and Redwood that "authorized SLA to direct [U.S. Bank] on Redwood's behalf and required SLA to manage all assets in accordance with South Carolina insurance law." (*Id.* at 19.) "Aon[,] as [Redwood's] [c]orporate [s]ecretary . . . , directed U.S. Bank to purchase [Destra UIT units] into the Redwood Trust Account[] or to deposit units into the Redwood Trust Account . . . ." (*Id.* at 27.) Aon did so by signing three investment orders directing U.S. Bank to make the purchases or deposits and, U.S. Bank alleges, these investment orders contained valuations of the units that were overinflated. (*Id.* at 27-28.) Based on this conduct, U.S. Bank alleges that, if it is found liable to Companion, Aon would also be liable to Companion, and Aon would be liable in contribution to U.S. Bank. (*Id.* at 28-29, 35-37.)

In asserting the court's personal jurisdiction over Aon, U.S. Bank alleges that Aon's "conduct and connections with South Carolina" amounted to "sufficient minimum contacts" with the state that personal jurisdiction would be warranted. (*Id.* at 9.) U.S. Bank listed the following conduct and connections in support of personal jurisdiction:

> (i) Aon was an Officer and Company Secretary of Redwood and signed the Redwood Trust Agreement on behalf of Redwood. Aon knew that Redwood had purposefully availed itself of South Carolina law by entering into the Redwood Trust Agreement with Companion, a South Carolina corporation and a South Carolina-regulated insurance company, and consenting to be governed by South Carolina law and the jurisdiction of courts in South Carolina[.]

(ii) Under the Redwood Trust Agreement, which is governed by South Carolina law and has a South Carolina insurance company as a beneficiary, Aon was listed as the contact for all notices, directions, requests or demands, acknowledgements and other communications required or permitted to be given or made. Aon executed the Redwood Trust Agreement on behalf of Redwood as Redwood's corporate secretary.

(iii) Aon employees were authorized signers on the Redwood Trust Account, which is governed by South Carolina law and has a South Carolina insurance company as the beneficiary.

(iv) Aon instructed U.S. Bank to contribute assets for deposit to the Redwood Trust Account, which is governed by South Carolina law and has a South Carolina insurance company as the beneficiary.

(*Id.* at 9-10 (internal citations and parenthetical omitted).)

On July 8, 2016, Burns filed a fourth-party complaint against USBT, asserting a claim for contribution. (ECF No. 143 at 1-2, 10.) Burns alleges that, if it is determined that he is liable to Companion, then USBT is liable to him to the extent that USBT is responsible for loss in the trust accounts' value stemming from the substitution into the accounts of overinflated Destra UIT units. (*Id.* at 2, 10.) In support of this claim, Burns alleges that USBT was named as the trustee and custodian of the Destra UITs at issue. (*Id.* at 7.) USBT "was obligated to calculate the assets of the Destra UITs and to report to unit holders the value of the unit[s]," "agreed . . . to calculate each series value and unit value of each series," and "agreed . . . to provide periodic statements of the transactions [for each series of the Destra UITs] and the assets on hand." (*Id.* at 8-9.) Burns alleges that USBT "breached its duty to Redwood and Freestone by [at least negligently] failing to accurately calculate and state the fair market value of the Destra UITs and by [at least negligently] permitting its affiliate, U.S. Bank, to value and substitute assets into the [trust accounts] before first determining that the fair market value of the Destra UITs was not less than the assets being replaced." (*Id.* at 9-10.)

Burns' fourth-party complaint does not state whether he asserts that the court has general or specific personal jurisdiction over USBT. He alleges, however, that USBT "is trustee and custodian to the Destra UITs," and that, in this capacity, USBT "deposited [Destra UIT units] into the [trust accounts.]" (*Id.* at 3.) He also alleges that "it was sufficiently foreseeable that the contractual forum clause [in the Trust Agreements] would apply to [USBT]" because "[a]s trustee and custodian of the Destra UITs, [USBT] sold or otherwise transferred the Destra UITs into the Trust Accounts which are governed under South Carolina law and which have a South Carolina insurance company as the beneficiary." (*Id.*) Thus, Burns asserts that USBT "has sufficient minimum contacts with South Carolina" so that the court's exercise of personal jurisdiction over USBT would be warranted. (*Id.*)

On August 17, 2016, Aon filed one of the instant motions to dismiss, seeking dismissal of U.S. Bank's third-party complaint as to it because, pursuant to Fed. R. Civ. P. 12(b)(2) and (6), the court lacks personal jurisdiction over it, and the amended third-party complaint fails to state a claim for relief for which the court could grant relief. (ECF Nos. 171, 171-1.) Regarding personal jurisdiction, U.S. Bank has disclaimed any reliance on general jurisdiction and, instead, asserts only specific jurisdiction. (*See* ECF No. 213 at 10 n.5.) There is no dispute that Aon is incorporated, and has its principal place of business, in the Cayman Islands, a British Overseas Territory, and not in South Carolina. *See Boren Found. v. HHH Inv. Trust*, 295 F. App'x 151 (9th Cir. 2008) (citing *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 90 (2002)).

On August 30, 2016, USBT filed the other instant motion to dismiss, seeking dismissal of Burns' fourth-party complaint for lack of personal jurisdiction and for failure to state a claim upon which relief could be granted under Rule 12(b)(2) and (6). (ECF No. 192, 192-1.) However, unlike

the other movant, Burns asserts that the court has personal jurisdiction over USBT under both general and specific jurisdiction. (*See* ECF No. 219 at 5-16.)  Nevertheless, there is no dispute that USBT is incorporated, and has its principal place of business, in Delaware and not South Carolina. (*See* ECF No. 143 at 2.)

On November 4, 2016, after the parties' briefs and supporting affidavits, along with exhibits, had been submitted, the court heard arguments from the parties regarding the motions to dismiss. These motions are now ripe for disposition.

## II. LEGAL STANDARD AND APPLICBALE LAW

When a defendant challenges the court's personal jurisdiction under Rule 12(b)(2), the plaintiff has "the burden of proving" that jurisdiction exists "by a preponderance of the evidence." *In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997). "If the existence of jurisdiction turns on disputed factual questions[,] the court may resolve the challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). "[W]hen . . . a district court rules on a Rule 12(b)(2) motion without conducting an evidentiary hearing or without deferring ruling pending receipt at trial of evidence relevant to the jurisdictional issue, but rather relies on the complaint and affidavits alone, 'the burden on the plaintiff is simply to make a prima facie showing of sufficient jurisdictional basis in order to survive the jurisdictional challenge." *In re Celotex Corp.*, 124 F.3d at 628; *see also New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005) (noting that a plaintiff need only make a prima facie showing of jurisdiction when the court does not conduct an evidentiary hearing). In deciding whether plaintiff has met this burden, the court construes all disputed facts and draws all reasonable inferences from the proofs in favor of jurisdiction. *Carefirst of Md., Inc. v. Carefirst Pregnancy*

*Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003); *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993). In ruling on a motion to dismiss for lack of personal jurisdiction, the court may consider evidence outside of the pleadings, such as affidavits and other evidentiary materials, without converting the motion to dismiss into a motion for summary judgment. *Magic Toyota, Inc. v. Se. Toyota Distribs., Inc.*, 784 F. Supp. 306, 310 (D.S.C. 1992).

A federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. Fed. R. Civ. P. 4(k)(1)(A); *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997). "Thus, for a district court to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment. *Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001).

South Carolina's long arm statute provides as follows:

A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's: (1) transacting any business in this State; (2) contracting to supply services or things in the State; (3) commission of a tortious act in whole or in part in this State; (4) causing tortious injury or death in this State by an act or omission outside this State if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State; (5) having an interest in, using, or possessing real property in this State; (6) contracting to insure any person, property, or risk located within this State at the time of contracting; (7) entry into a contract to be performed in whole or in part by either party in this State; or (8) production, manufacture, or distribution of goods with the reasonable expectation that those goods are to be used or consumed in this State and are so used or consumed.

S.C. Code Ann. § 36–2–803(A) (2005). "South Carolina's long-arm statute has been interpreted to reach the outer bounds permitted by the Due Process Clause." *ESAB Grp.*, 126 F.3d at 623. Therefore, the appropriate question for the court in considering a personal jurisdiction defense

raised by an out-of-state defendant is whether that defendant has "minimum contacts with [South Carolina] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has "minimum contacts" with the forum state, such that to require the defendant to defend its interests in that state "does not offend traditional notions of fair play and substantial justice.")); *see Callum v. CVS Health Corp.*, 137 F. Supp. 3d 817, 834 (D.S.C. 2015) ("Because the South Carolina long-arm statute is coextensive with the Due Process Clause, the sole question on a motion to dismiss for lack of personal jurisdiction is whether the exercise of personal jurisdiction would violate due process." (citing *Tuttle Dozer Works, Inc. v. Gyro–Trac (USA), Inc.,* 463 F. Supp. 2d 544, 547 (D.S.C. 2006); *Cockrell v. Hillerich & Bradsby Co.*, 611 S.E.2d 505, 508 (2005))).

Personal jurisdiction may arise through specific jurisdiction, based on the conduct alleged in the suit, or through general jurisdiction. *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 n. 15 (4th Cir. 2009); *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711 (4th Cir. 2002). Under general jurisdiction, a defendant's contacts or activities in the forum state are not the basis for the suit, but it may be sued in this court "for any reason, regardless of where the relevant conduct occurred," because its activities in South Carolina are "continuous and systematic." *CFA Inst.*, 551 F.3d at 292 n.15. These activities must be "so substantial and of such a nature as to justify suit against [a defendant] on causes of action arising from dealings entirely distinct from those activities." *Int'l Shoe Co.*, 326 U.S. at 318. When the defendant is a corporation, "general jurisdiction requires affiliations 'so continuous and systematic as to render [the foreign corporation] essentially at home in the forum State,' *i.e.*, comparable to a domestic enterprise in that State." *Daimler AG v. Bauman*, ___ U.S. ___, 134 S. Ct. 746, 758 n.11 (2014)

(internal citation and quotation marks omitted) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 576 U.S. 915, 919 (2011)).

Under specific jurisdiction, a defendant may be sued in this court if the litigation results from alleged injuries that arose out of or related to their contacts with South Carolina and those contacts were sufficient. *See, e.g.*, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984). To determine whether specific jurisdiction exists, courts employ a "minimum contacts" analysis that examines "(1) the extent to which the defendant 'purposefully avail[ed]' itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *ALS Scan, Inc.*, 293 F.3d at 712. Because this three-part inquiry "'focuses on the relationship among the defendant, the forum, and the litigation,'" the Supreme Court has emphasized "[t]wo related aspects of this necessary relationship." *Walden v. Fiore*, ___ U.S. ___, 134 S. Ct. 1115, 1121-22 (2014) (quotation marks omitted) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). "First, the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Id.* at 1122 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, (1985)). "Second, [the] 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.*

### III. ANALYSIS

Having reviewed U.S. Bank's third-party complaint against Aon and Burns' fourth-party complaint against USBT, the court concludes that U.S. Bank and Burns have failed to meet their respective burdens to show that Aon and USBT are subject to personal jurisdiction in this court.

The court begins its analysis with USBT's motion to dismiss before turning to Aon's motion to dismiss.

**A. USBT's motion to dismiss Burns' fourth party complaint**

<u>1. General jurisdiction</u>

<u>a. The parties' arguments</u>. In its motion to dismiss, USBT, relying on *Daimler AG*, argues that it is not subject to the court's general jurisdiction because it is neither incorporated nor headquartered in South Carolina and because it is not otherwise "at home" in South Carolina.[4] (ECF No. 192-1 at 9.) USBT contends that, to be deemed otherwise at home in South Carolina, Burns would have to demonstrate that USBT's in-state presence is exceptional and that he has failed to make this showing. (*Id.*)

Although, in his complaint, Burns does not appear to premise this court's personal jurisdiction over USBT on a theory of general jurisdiction (*see* ECF No. 143 at 3), he does so expressly in his response to USBT's motion to dismiss (*see* ECF No. 219 at 5-8). Although he concedes that USBT does not fall under the paradigm examples for general jurisdiction—it is not incorporated or headquartered in South Carolina—Burns asserts that USBT is at home in South Carolina, for purposes of the test enunciated in *Daimler AG*, because its business contacts with South Carolina are so continuous and systematic as to render it essentially at home in South Carolina. (ECF No. 219 at 6.) In support of this assertion, Burns presents evidence, in the form of affidavits and supporting exhibits attached to his response, which, he claims, demonstrate that

---

[4] The court notes that USBT does not argue that personal jurisdiction is lacking pursuant to South Carolina's long-arm statute but, instead, focuses solely on due process limitations to general jurisdiction. For this reason, and because, as the court previously noted, South Carolina's long-arm statute is coterminous with due process limitations on jurisdiction, the court concludes that it is unnecessary to address Burns' argument directed to jurisdiction pursuant to the statute. (*See* ECF No. 219 at 6.)

USBT is a co-trustee of "several large residential mortgage trusts," and, in this role, "lend[s] to South Carolina citizens," "handles conveyances of, and perfects and protects, security interests in, rights to countless South Carolina properties," "administ[ers] on behalf of lenders, prepar[es], negotiate[es] and record[s] interests in South Carolina real property," "handles defaults and foreclosures, preparing and sending notices of default and serving legal process upon countless South Carolina citizens," "commences and prosecutes foreclosure proceedings against South Carolina citizens in the state courts of South Carolina on a regular and routine basis," and "operates . . . [a] South Carolina office." (*Id.* at 7-8.)

b. The court's review. Because Burns seeks to assert the court's general jurisdiction over USBT based on the argument that USBT's contacts with South Carolina present an "exceptional case," he faces a heavy burden. *See Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016); *Kipp v. Ski Enter. Corp. of Wis.,* 783 F.3d 695, 698 (7th Cir. 2015); *Martinez v. Aero Caribbean,* 764 F.3d 1062, 1070 (9th Cir. 2014); *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014). The court concludes that Burns has failed to meet this burden and has failed to show that USBT is subject to the court's general jurisdiction.

In *Daimler AG*, the Supreme Court reiterated that, "'[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is *an equivalent place*, one in which the corporation is fairly regarded as at home.'" 134 S. Ct. at 760 (emphasis added) (quoting *Goodyear*, 564 U.S. at 934). The "place of incorporation and principal place of businesses" will be fairly regarded as home for the corporation as these are the "paradigm bases for general jurisdiction" for corporations. *Id.* (brackets and ellipsis omitted). Only in an "exceptional case" might a "corporation's operations in a forum other than its formal place of

incorporation or principal place of business . . . be so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 761 n.19.

The Court clarified that the general jurisdiction inquiry is not merely whether the corporation's contacts with the state "'can be said to be in some sense continuous and systematic'" but rather whether they are "'so continuous and systematic as to render it essentially at home'" in the state. *Id.* at 761 (quoting *Goodyear*, 564 U.S. at 919); *see Goodyear*, 564 U.S. at 927 ("A corporation's 'continuous activity of some sorts within a state'. . . 'is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'" (quoting *Int'l Shoe*, 326 U.S. at 318)). Particularly relevant here, the *Daimler AG* Court further clarified that

> the general jurisdiction inquiry does not focus solely on the magnitude of the defendant's in-state contacts. General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide. A corporation that operates in many places can scarcely be deemed at home in all of them. Otherwise, "at home" would be synonymous with "doing business" tests framed before specific jurisdiction evolved in the United States. Nothing in *International Shoe* and its progeny suggests that a particular quantum of local activity should give a State authority over a far larger quantum of activity having no connection to any in-state activity.

*Id.* at 762 n.20 (internal quotation marks, citations, and ellipsis omitted). Thus, at a minimum, a plaintiff asserting general jurisdiction under *Daimler*'s exceptional case must provide evidence from which a court could appraise the corporation's activities in the state in comparison with the corporation's activities "in their entirety, nationwide and worldwide." *Id.*; *see Ranza v. Nike, Inc.*, 793 F.3d 1059, 1070 ("[T]he general jurisdiction inquiry examines a corporation's activities worldwide—not just the extent of its contacts in the forum state—to determine where it can be rightly considered at home."); *In re Celotex Corp.*, 124 F.3d at 628 ("[T]he burden [is] on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence."). To the extent such evidence is in the record, the court must determine whether it

14

sufficiently supports a finding, either by preponderance or in a prima facie manner, that the defendant corporation has such continuous and systematic contact with the state, in proportion to its worldwide activities, that it may be deemed domiciled in the state.

Here, the court notes that Burns has provided evidence only of USBT's activities within South Carolina. Indeed, he explains that the evidence he adduces, which attests to USBT's activities as a trustee for residential mortgage trusts and as a mortgagee, is in an effort to show USBT's "extensive contact with South Carolina." (ECF No. 219 at 8.) Alone, this evidence would be insufficient, as it fails to provide the court with adequate information to appraise the extent of USBT's activities in South Carolina in comparison to its activities worldwide. The only evidence regarding USBT's activities outside of South Carolina—provided by USBT—are printouts of recent docket searches for cases in which USBT was a party. (*See* ECF Nos. 251-2, 251-3, 251-4, 251-5, 251-6, 251-7). One of these searches showed that, of the cases in the United States in the last five years in which USBT was a party, only 1.3% of them were filed in South Carolina. (ECF No. 251-2 at 2.) Thus, the only evidence from which the court can compare USBT's in-state activities to its worldwide activities hardly compels a conclusion that USBT is at home in South Carolina. Accordingly, the court concludes that Burns has failed to meet his burden to show that USBT should be subject to this court's general jurisdiction.

2. Specific jurisdiction

a. The parties' arguments. USBT asserts that the court's assessment of its specific jurisdiction over USBT is confined to the actions of USBT that underlie the allegations in Burns' suit. (ECF No. 192-1 at 9.) USBT further asserts that the only such allegations in Burns' complaint are that USBT (1) "[s]erved as trustee and custodian of the Destra UIT," (2) "'[d]eposited units of the Destra UIT into Freestone and Redwood Trust Accounts," and (3) "'[s]old or otherwise

transferred units of the Destra UIT into the Freestone and Redwood Trust Accounts." (*Id.*) With regard to the first of these actions, USBT argues that its serving as trustee and custodian of the Destra UIT is not an activity directed at South Carolina. (*Id.* at 10-11.) With regard to the other two actions, USBT denies having deposited, sold, or otherwise transferred units of Destra UIT into the trust accounts. (*Id.* at 11). USBT notes that Burns' prior pleading attributes the deposit of Destra UIT units to other parties (*id.* at 11-12; *compare* ECF No. 131 at 23, 26-27, *with* ECF No. 139 at 12, 14-15) and submits as exhibits documents that, it asserts, demonstrates that USBT did not deposit, sell, or otherwise transfer units of Destra UIT into the trust accounts. (ECF No. 192-1 at 12; *see* ECF No. 192-3 at 4-6; ECF Nos. 197, 197-1, 197-2, 197-3, 197-4, 197-5, 197-6, 197-7, 197-8, 197-9, 197-10.) USBT also argues that, to the extent Burns asserts specific jurisdiction on U.S. Bank's contacts with South Carolina, such affiliation-based specific jurisdiction is not permitted. (ECF No. 192-1 at 12.) Accordingly, USBT contends that Burns has not satisfied his burden to demonstrate that USBT purposefully availed itself of the privilege of conducting business in South Carolina and, thus, that this court cannot exercise specific jurisdiction over it.[5] (*Id.* at 12-13.)

In response, Burns argues that, although he "is confined to the specific tortious conduct alleged within his cause of action as his basis for long-arm [jurisdiction], [he] may rely upon [USBT]'s broader unrelated contacts with this forum to the extent it 'regularly' does business here." (ECF No. 219 at 10.) Accordingly, in addition to the three actions USBT referenced, Burns asserts that he alleged that USBT (1) "agreed to provide periodic statements of the transactions of

---

[5] Again, the court notes that USBT does not argue that personal jurisdiction is lacking pursuant to South Carolina's long-arm statute but, instead, focuses solely on due process limitations to specific jurisdiction. For the reasons stated in note 4, *supra*, the court concludes that it is unnecessary to address Burns' argument directed to jurisdiction pursuant to the statute. (*See* ECF No. 219 at 9-12.)

each Series and the assets on hand," (2) "failed to accurately calculate and state the fair market value of the Destra UITs and . . . permit[t]ed its affiliate, U.S. Bank[,] to value and substitute assets into the Reinsurance Trusts before first determining that the fair market value of the Destra UITs was not less than the assets bring replaced," and (3) "caused the alleged damages arising from or related to the substitution of Destra UITs into the Reinsurance Trusts." (*Id.* at 11 (brackets omitted).)  Burns asserts that these actions meet the first two parts of the three-part minimum contacts test under "[t]he totality of the facts." (*Id.* at 15.) Burns specifically points out that, "[a]s trustee of the Destra UITs . . . , [USBT] purposefully directed activity toward South Carolina" because it "knew that the Destra UITs would be deposited into the Reinsurance Trusts maintained by its sister affiliate, Defendant U.S. Bank." Furthermore, Burns argues, USBT "not only could reasonably foresee that any dispute relating to the Destra UITs could involve a lawsuit in South Carolina, especially because its affiliate chose to bring its contribution claims here." (*Id.* at 16.)

In reply, USBT maintains that, for specific jurisdiction, its own actions, and not the actions of U.S. Bank, must be evaluated. (ECF No. 251 at 12.) USBT notes that Burns abandoned, as a basis for specific jurisdiction, his claim that USBT deposited Destra UIT units in the trust accounts, and appears to rely almost exclusively on the allegation that USBT knew that the units would be deposited in the trust accounts. (*Id.*) This, USBT asserts, is not enough because mere knowledge of other parties' contacts with the forum state does not support the exercise of specific jurisdiction and because Burns has provided no evidence or even allegations that support the allegation that USBT had the knowledge he ascribes to it. (*Id.* at 12-13.)

b. The court's review. To satisfy due process, "the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). The Fourth Circuit uses a three-part test, and each part focuses on the defendant: (1) the

extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the claims against the defendant arise out of the defendant's activities directed at the State; and (3) whether the exercise of personal jurisdiction over the defendant would be constitutionally reasonable. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009).

As the Supreme Court recently emphasized, in conducting a minimum contacts analysis, the court must keep in mind that "*the defendant's suit-related conduct* must create a substantial connection with the forum State." *Walden*, 134 S. Ct. at 1121 (emphasis added); *see Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 ("Specific jurisdiction must rest on the *litigation-specific* conduct of the defendant in the proposed forum state. The only [actions] that would be relevant are those that were related to [the defendant's] allegedly unlawful activity."). If the plaintiff, who bears the burden to prove that specific jurisdiction is warranted, fails to provide evidence of conduct by defendant on which specific jurisdiction is premised, that conduct will not support the exercise of jurisdiction. *See Real Action Paintball*, 751 F.3d at 801. Further, "merely 'conclusory allegations' not supported by 'specific facts'" will not do. *Salley v. Heartland-Charleston of Hanahan, SC, LLC*, 2010 WL 5136211, at *3-4 (D.S.C. Dec. 10, 2010) (quoting *Masselli & Lane, PC v. Miller & Schuh,* 215 F.3d 1320, 2000 WL 691100, at *1 (4th Cir. 2000) (unpublished table decision); *Magic Toyota*, 784 F. Supp. at 310). With these principles in mind, the court begins by identifying USBT's suit-related conduct.

As an initial matter, the court agrees with USBT that Burns cannot rely on the allegation that USBT deposited, sold, or otherwise transferred Destra UIT units into the trust accounts. Not only does it appear that Burns has abandoned that allegation as a basis for jurisdiction, but Burns

has also provided no evidence supporting the allegation. In fact, the only evidence, submitted by USBT, demonstrates that the allegation is without factual support.

Aside from this abandoned allegation, the court must decide whether the four other allegations on which Burns relies each amount to suit-related, litigation-specific conduct, connected to USBT's allegedly wrongful activity. As Burns' claim is for contribution, the injury he alleges is to Companion and is based on USBT's failing to accurately value the Destra UIT and causing U.S. Bank to substitute Destra UIT units into the trust accounts. (*See* ECF No. 143 at 9-10.) Although Burns pointed to his allegation that USBT "agreed to provide periodic statements of the transactions of each Series and the assets on hand" as a basis for specific jurisdiction (*id.* at 8; ECF No. 219 at 11), this allegation is simply not sufficiently related to the wrongful activity underlying his claim for contribution under *Walden* and *Real Action Paintball*. Burns also points to his allegation that USBT caused the alleged damages to Companion arising from the substitution of Destra UIT units into the trust accounts. (ECF No. 143 at 10; ECF No. 219 at 11.) The court concludes that this allegation is merely conclusory and declines to credit it for purposes of exercising personal jurisdiction. *See Salley*, 2010 WL 5136211, at *3-4.

The remaining suit-related allegations are that USBT (1) served as trustee and custodian of Destra UIT and (2) failed to accurately calculate and state the fair market value of Destra UIT units and permitted U.S. Bank to value and substitute units into the trust accounts. The question arises how USBT's serving as a trustee of a Delaware trust and failing to accurately calculate the value of the units of that trust amounts to USBT's purposefully availing itself of the privilege of conducting business in South Carolina. The only explanation Burns offers is that, by accepting a role as trustee, USBT knew that Destra UIT units would be deposited by other parties in trust accounts maintained by U.S. Bank. (ECF No. 219 at 15.)

19

Burns' explanation runs afoul of the Supreme Court's admonition that the defendant's relationship to the state "must arise out of contacts that the defendant *himself* creates with the forum State." *Walden*, 134 S. Ct. at 1122. Indeed, the Supreme Court "ha[s] consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between . . . third parties[] and the forum State." *Id.*; *see id.* at 1123 ("[A] defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction.") A defendant's knowledge that a plaintiff has "strong forum connections" and that the plaintiff will suffer harm in the forum does not satisfy the minimum contacts test, as it "impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis," rather than contacts created by the defendant. *Id.* at 1124-25; *accord Rockwood Select Asset Fund XI (6)-1, LLC v. Devine, Millimet & Branch*, 750 F.3d 1178, 1180 (10th Cir. 2014). As *Walden* treats third parties and plaintiffs similarly, the court sees no reason to reject a corollary to the rule just expressed—a defendant's knowledge that a third party has strong connections to a state, such that harm to that third party or caused by that third party is likely to occur in the state, alone, does not amount to the defendant's purposefully availing himself of the privilege of conducting activities in that state. The same rationale that applies in the case of a plaintiff would apply in the case of a third party: focus on a defendant's knowledge regarding a third party's contacts allows the third party's contacts, rather than contacts created by the defendant, to control jurisdiction. *See Maxitrate Tratamento Termico E Controles v. Super Sys., Inc.*, 617 F. App'x 406, 408 (6th Cir. 2015) (explaining that, in *Walden*, "the Supreme Court rejected th[e] theory" that "if a defendant knows that its intentional acts will cause effects in a state, then that state can exercise jurisdiction over the defendant"); *Campinha-Bacote v. Wick*, No. 1:15-cv-277, 2015 WL 7354014, at *5 (S.D. Ohio Nov. 20, 2015)

("[If] the allegations show, at best, that Defendant merely knew or should have known that her actions may have some effect in [the state, t]hat is not enough to show purposeful availment.").

In sum, the only suit-related allegation that Burns raises in support of the court's jurisdiction over USBT based on its purposefully availing itself of the privilege of conducting activities in South Carolina is that USBT, in its role as trustee of the Destra UIT, knew that other parties would deposit Destrat UIT units in trust accounts that have a South Carolina insurer as the named beneficiary, which might then generate litigation over those units in South Carolina. The court concludes that, under *Walden* and the few cases emanating from it, such knowledge by USBT, even if supported by the evidence, would not amount to purposeful availment because it is not contact with South Carolina created by USBT.

Because Burns has failed to meet his burden to demonstrate that USBT should be subject to this court's general or specific personal jurisdiction, the court must dismiss Burns' complaint for lack of personal jurisdiction, pursuant to Rule 12(b)(2). The court declines to consider USBT's alternative ground for dismissal that Burns' complaint seeking contribution fails to state a claim for which the court could grant relief.

**B. Aon's motion to dismiss U.S. Bank's third-party complaint as to it**

<u>1. The parties' arguments</u>

As previously noted, U.S. Bank has not asserted that Aon is subject to the court's general personal jurisdiction, and the parties address their jurisdictional arguments solely to the issue of specific jurisdiction. In its motion to dismiss, Aon asserts that U.S. Bank has not met its burden to show that the exercise of specific personal jurisdiction would comport with due process.[6] (ECF

---

[6] Although, unlike USBT, Aon argues that personal jurisdiction is lacking under South Carolina's long-arm statute (*see* ECF No. 171-1 at 15-16), the court declines to address this argument because, as the court has explained and as Aon acknowledges (*see id.* at 17), "the South Carolina long-arm

No. 171-1 at 17-23.) Aon begins, as it should, by extracting from the third-party complaint, U.S. Bank's allegations of Aon's conduct on which U.S. Bank's suit is based, and lists five such allegations: that Aon (1) "was [o]fficer and [c]ompany [s]ecretary of Redwood," (2) "signed the Redwood Trust Agreement (to which a South Carolina entity was a party) on behalf of Redwood," (3) "was listed as the contact for notices under the Redwood Trust Agreement" (4) had "employees [who] were authorized for Redwood on the Redwood Trust Account," and (5) "instructed U.S. Bank to contribute assets for deposit to the Redwood Trust Account, which is governed by South Carolina law and has a South Carolina insurance company as the beneficiary." (*Id.* at 19.) Although it makes several tertiary points,[7] Aon's primary argument is that each of these allegations amount to conduct by Redwood, not by Aon, because all of the actions at issue were taken by Aon only in its capacity as Redwood's corporate secretary. (*See id.* at 20-21.) Moreover, Aon provides evidence that all of its activities as Redwood's corporate secretary were performed in the Cayman Islands, not in South Carolina. (*Id.* at 21-22.) It admits to sending several emails from the Cayman Islands to Companion in South Carolina, in its capacity as Redwood's corporate secretary, but contends that these limited contacts are not sufficient for specific personal jurisdiction. (*Id.*)

    In response, U.S. Bank provides a litany of Aon's activities as Redwood's company secretary. First, U.S. Bank points out that, as Redwood's company secretary, Aon executed the Redwood Trust Agreement among Redwood, Companion, and U.S. Bank, and that the Trust

---

statute is coextensive with the Due Process Clause[; thus,] the sole question on a motion to dismiss for lack of personal jurisdiction is whether the exercise of personal jurisdiction would violate due process," *Callum*, 137 F. Supp. 3d at 834.

[7] Aon argues that "[a] choice of law provision, though it establishes governing law, cannot by itself establish personal jurisdiction." (ECF No. 171-1 at 20 (citing *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016)).) Aon also quotes *Walden* for the proposition that "'an individual's contract with an out-of-state party *alone* [cannot] automatically establish sufficient minimum contacts in the other party's home forum.'" (*Id.* (quoting *Walden*, 134 S. Ct. at 122-23).)

Agreement permits only substitutions that comply with South Carolina law, allows substitutions of only assets that comply with South Carolina law, requires Redwood to sue in South Carolina, and requires communications be addressed to Companion in South Carolina. (ECF No. 213 at 9.) Second, Aon signed a "Reinsurance Agreement" on behalf of Redwood with Companion, and U.S. Bank points out that Aon sent the Reinsurance Agreement to Companion in South Carolina for signature, that the Reinsurance Agreement specifies that it is deemed to have been performed in South Carolina, and that the parties agreed that disputes would be governed by South Carolina law and disputes would be litigated in South Carolina. (*Id.* at 9-10.) Third, U.S. Bank asserts that Aon, "as [c]ompany secretary and an authorized signer," "directed U.S. Bank to deposit over $35 million in cash into Companion and Redwood's trust account, to satisfy Redwood's obligations to Companion under the parties' reinsurance arrangement" and "also directed U.S. Bank to deposit into Companion and Redwood's trust account units of the Destra . . . UIT with a face value of approximately $68.7 million." (*Id.* at 10-11.) In explaining the relevance of this allegation, U.S. Bank states that "it was reasonably foreseeable and Aon should have known, did know, and intended—that U.S. Bank would relay the asset values received from Aon to Companion in South Carolina." (*Id.* at 11.) Fourth, U.S. Bank provides evidence of six instances in which Aon, acting as Redwood's corporate secretary, asked Companion in South Carolina to provide information pursuant to the Redwood Trust Agreement, one instance in which Aon advised Companion that it was in the process of confirming that U.S. Bank was transferring a payment to a trust account, and one instance in which "Aon and Companion discussed a transfer of income among various Redwood/Companion accounts at U.S. Bank." (*Id.* at 12-13.) Fifth, U.S. Bank provides evidence that Aon directed wire payments totaling $22 million to Companion in South Carolina. (*Id.* at 13-14.)

Taking all of this activity into account, U.S. Bank argues that specific jurisdiction is proper because, "[a]s Redwood's sole officer and Company Secretary, Aon purposefully directed activity toward South Carolina as part of a long-term reinsurance arrangement with a focus on South Carolina." (*Id.* at 17.) In its estimation, "[t]he totality of these facts . . . demonstrate a substantial purposeful connection between Aon and South Carolina," as Aon's contacts, "were an integral part of the management, financial, administrative, and advisory services that Aon provided in support of a business relationship expressly rooted in South Carolina's insurance scheme." (*Id.* at 20.) With Aon's conduct so characterized, U.S. Bank has no problem concluding that all of its claims against Aon arise out of Aon's activities aimed at South Carolina. (*Id.* at 22-23.)

In response to Aon's argument that the conduct on which U.S. Bank relies is conduct by Redwood, U.S. Bank states that, to exercise specific personal jurisdiction over a corporate officer, it need only show "'direct, personal involvement by the corporate officer in some decision or action which is causally related to plaintiff's injury.'" (*Id.* at 21 (quoting *Magic Toyota*, 784 F. Supp. at 315).) It asserts that its allegations are "sufficient to show Aon's direct involvement in actions causally related to Companion's purported injury." (*Id.*)

In reply to U.S. Bank's minimum contacts analysis, Aon makes three arguments. First, Aon again asserts that all of the allegations against it relate only to actions it took in its capacity as corporate secretary to Redwood. (ECF No. 216 at 6.) It posits that, under Fourth Circuit law, an out-of-state corporate officer is not subject to specific personal jurisdiction for actions taken outside the forum state in its representative capacity unless the officer acted as the "guiding spirit" or "central figure" in the alleged wrongful conduct. (*Id.* at 8-10 (citing *Columbia Briargate Co. v. First Nat'l Bank*, 713 F.2d 1052 (4th Cir. 1983); *Magic Toyota*, 784 F. Supp. 306).) Aon notes that it is not alleged to have been a guiding spirit or central figure in the harm to Companion allegedly

caused by Redwood; rather, that role has been attributed by U.S. Bank to Burns. (*Id.* at 10-11.) Second, and relatedly, Aon argues that Redwood's contacts with South Carolina cannot automatically be attributed to Aon, because Aon has not created those connections. (*Id.* at 11-13.) Third, Aon argues that U.S. Bank's allegations that Aon wired funds to Companion in South Carolina and sent emails to Companion in South Carolina are not suit-related activities. (*Id.* at 13-14.)[8]

2. The court's review

a. The *Columbia Briargate* decision. As the parties' briefing and their oral arguments suggest, the court's exercise of personal jurisdiction over Aon turns on theories underlying the so-called "fiduciary shield" doctrine, which the Fourth Circuit first addressed in *Columbia Briargate Co. v. First National Bank*, 713 F.2d 1052 (4th Cir. 1983). *See Springs Indus., Inc. v. Gasson*, 923 F. Supp. 823, 825 (D.S.C. 1996) ("In [*Columbia Briargate*], the Fourth Circuit addressed the fiduciary shield doctrine for the first time."). In *Columbia Briargate*, a bank and its vice president, both domiciled in Texas, were sued for torts alleged to have been committed in South Carolina. 713 F.2d at 1053. The vice president moved to dismiss the complaint as to him for lack of personal jurisdiction, asserting that "he had acted solely in a representative capacity on behalf of the [b]ank in all his contacts with the State of South Carolina," and the district court granted the motion under the fiduciary shield doctrine. *Id.* at 1053-54 (internal quotation marks omitted).

"'Under the fiduciary shield doctrine,' as it has generally been phrased, 'the acts of a corporate officer or employee taken in his corporate capacity within the jurisdiction generally do

---

[8] The parties' briefs address whether exercising personal jurisdiction over Aon would be constitutionally reasonable. (*See* ECF No. 171 at 22-23; ECF No. 213 at 23-24; ECF No. 216 at 14-16.) Because the court concludes U.S. Bank has not met its burden to demonstrate sufficient minimum contacts, the court declines to reach this argument.

not form the predicate for jurisdiction over him in his individual capacity.'" *Id.* at 1055-56 (internal

quotation marks and brackets omitted) (quoting *Bulova Watch Co. v. K. Hattori & Co., Ltd.*, 508

F. Supp. 1322, 1347 (E.D.N.Y 1981)). On appeal, The *Columbia Briargate* Court noted that the

fiduciary shield doctrine, so defined, appears to be inconsistent with substantive tort law that

permits a corporate agent to be sued and held liable "for torts committed in his fiduciary capacity

. . . , provided the alleged tort was committed or participated in by the agent." *See id.* at 1055

(collecting cases and other authorities). Thus, the Court endeavored to determine the applicability

of the doctrine in South Carolina.

The *Columbia Briargate* Court first determined that the fiduciary shield doctrine, as a

purely statutory creation, should not be applied in states, such as South Carolina, which have

enacted long-arm statutes that "extend[] . . . 'to the outer perimeter allowed by due process.'" *Id.*

at 1057 (quoting *O'Neal v. Hicks Brokerage Co.*, 537 F.2d 1266, 1268 (4th Cir. 1976); *Triplett v.*

*R.M. Wade & Co.*, 200 S.E.2d 375, 378-79 (S.C. 1973)). In reaching this conclusion, the Court

explained that, because, under such long-arm statutes, the normal two-prong jurisdictional inquiry

collapses into determining whether the exercise of personal jurisdiction comports with due process,

it was "proper . . . to proceed directly to the dispositive issue of whether the doctrine can be said

to represent a due process qualification or limitation upon the effective use of the state's long-arm

statute . . . ." *Id.* The Court then embarked in a lengthy and thorough dissertation on the relation

between the fiduciary shield doctrine and the due process constraints on a court's authority to

subject foreign defendants to its personal jurisdiction. *See id.* "In seeking to answer the dispositive

question," the Court observed that it "must identify at the outset the due process requirements

established by the Supreme Court for acquiring jurisdiction in a forum state over a non-resident

under a state long-arm statute." *Id.* After systematically detailing the Supreme Court's

jurisprudence, *id.* at 57-58, and canvassing the extant cases addressing the basis for the fiduciary shield doctrine, *id.* at 1058-60, the *Columbia Briargate* Court determined that the greater weight of authority supported the conclusion that the doctrine was not a facet of the constitutional due process limitations on personal jurisdiction, *id.* at 1060.

Having concluded that constitutional due process does not support a blanket rule immunizing a corporate agent from personal jurisdiction over him individually for actions taken in his capacity as an agent, the *Columbia Briargate* Court hastened to add, "[t]hat is not to say that the amenability of a non-resident corporate agent to long-arm service is always the same as that of his corporate employer. There are situations where the corporation may be amenable and the agent is not under sound due process reasoning." *Id.* Beginning with *Idaho Potato Commission v. Washington Potato Commission*, 410 F. Supp. 171 (D. Idaho 1976), the Court then engaged in a detailed analysis of the available case law illustrating "[t]he circumstances under which the corporation may be amenable and the agent not." *Id.*; *see id.* at 1060-65. The *Idaho Potato* opinion, the Court noted involved the "amenability [of a corporate agent] to jurisdiction under the forum's long-arm statute." *Id.* at 1060. In reviewing the case, the Court noted:

> In *Idaho Potato,* the court distinguished between the situation where the non-resident agent had come into the forum state and committed there the alleged tort and that where the non-resident agent had never been in the state and had no causal connection within the state with the alleged tort. In the first situation, it would find clear amenability to jurisdiction under the forum's long-arm statute. . . . On the other hand, it would deny amenability to jurisdiction over an agent whose activities occurred without the forum state, though those activities may have had an effect in the forum state. . . . [A] corporation which engages in activities having foreseeable ramifications beyond the state in which it is physically present may have sufficient connection or "contacts" with a distant forum where the ramifications are felt but that it is quite another matter to hold that an individual working for that same corporation, who has never been present in the distant forum with regard to a corporate transaction, and has no reason to foresee responsibility in the forum state has a similar connection or "contacts" with the distant forum. In essence, what the court in *Idaho Potato* held was that when the corporate agent has not committed a tort

> in the forum state his foreseeable "contacts" with that state are too tenuous to
> establish those "minimum contacts" essential for jurisdiction but that if the
> agent has come into the forum and while there has committed a tort, he has
> thereby purposefully availed himself of the laws of another state and of the
> privilege of conducting activities within the forum state, it seems that his being
> called on to respond for his tort in the forum state is sufficiently foreseeable to
> sustain jurisdiction over him under the state long-arm statute.

*Columbia Briargate*, 713 F.2d at 1060-61 (internal quotation marks, brackets, and footnote

omitted) (quoting *Idaho Potato*, 410 F. Supp. at 182-83).

The Court explained that "[t]his distinction . . . explicated in *Idaho Potato*"—meaning the

distinction between an agent who commits the alleged tort in the forum state and an agent whose

activity connecting him to the alleged tort occurs outside the forum state—"is consistent with [the]

due process reasoning" the Court had previously outlined. *Id.* at 1061 (citing *World-Wide*

*Volkwagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980)). It then re-explained the reasoning

behind *Idaho Potato* in terms of due process limitations on jurisdiction:

> If the agent has never been in the forum state and has had no "causal
> connection" with the alleged tort and has no reason to foresee being made
> amenable to suit therein, it would be unfair to require him to come to such state
> to defend a tortious act not participated in by him in that state but that same
> reasoning would not apply to a corporation carrying on an interstate business
> whose tortious conduct had had a harmful result in the state. However, where
> the agent has come into the state and has actually committed the tort which
> forms the gravamen of the cause of action within the state, it is not unfair to
> require him to defend in the exact forum state where he committed that tort and
> where he availed himself of the privileges of the state. In the latter instance,
> there can be no due process violation in an exercise of jurisdiction over the
> non-resident agent by the forum state.

*Id.* at 1061 (footnote omitted).

The Court further noted that the distinction drawn by *Idaho Potato* accorded with decisions

in federal courts in jurisdictions that had accepted the fiduciary shield doctrine. First, "the three

federal courts of appeals decisions which are most often cited as illustrative of the application of

the doctrine as a constitutional principle" drew the same distinction as *Idaho Potato* as "the

decision in each was rested expressly upon the fact that the agent had not actually and individually participated in a tort in the forum state." *Id.* at 1061; *see id.* at 1061-62 (citing *Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87 (2d Cir. 1975); *Weller v. Cromwell Oil Co.*, 504 F.2d 927 (6th Cir. 1974); *Wilshire Oil Co. v. Riffe*, 409 F.2d 1277 (10th Cir. 1969). Second, a number of district court decisions were cited for the same principle. *See id.* at 1062-63 (citing *Hyatt Int'l v. Inversiones Los Jabillos, C.A.*, 558 F. Supp. 932 (N.D. Ill. 1982); *Knorr Brake Corp. v. Harbil, Inc.*, 550 F. Supp. 476 (N.D. Ill. 1982); *Agra Chem. Distrib. Co. v. Marion Labs., Inc.*, 523 F. Supp. 699 (W.D.N.Y. 1981); *Techno Corp. v. Dahl Assocs., Inc.*, 521 F. Supp. 1036 (W.D. Pa. 1981); *Bloom v. A.H. Pond Co., Inc.*, 519 F. Supp. 1162 (S.D. Fla. 1981); *Kinstler v. Saturday Evening Post Co.*, 507 F. Supp. 113 (S.D.N.Y. 1981); *Chancellor v. Lawrence*, 501 F. Supp. 997 (N.D. Ill. 1980)).

The *Columbia Briargate* Court also noted "that the doctrine, confined as *Idaho Potato* did, would accord with the decisions in those jurisdictions which apparently have not accepted the 'fiduciary shield' doctrine," and specifically cited *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902 (1st Cir. 1980). *Columbia Briargate*, 713 F.2d at 1063. The Court noted that, in *Escude Cruz*, the claims against out-of-state officers of an out-of-state corporation were dismissed "because of the failure of the plaintiff to show any 'direct personal involvement by the corporate officer[s] in some decision or action which was causally related to plaintiff's injury' in [the forum state]." *Id.* (brackets omitted) (citing *Escude Cruz*, 619 F.2d at 907). The Court explained that the *Escude Cruz* decision "seemed to equate amenability to long-arm jurisdiction with substantive liability in tort of the agent" and had ruled that "'[w]hat is required is some showing of direct, personal involvement by the corporate officer in some decision or action which is causally related to the plaintiff's injury[]' [and that s]uch 'direct personal involvement' typically existed . . . 'where the defendant agent was the guiding spirit behind the wrongful conduct, or the central figure in the

challenged corporate activity." *Id.* (internal quotation marks, brackets, and parenthetical omitted) (quoting *Escude Cruz*, 619 F.2d at 902). The Court then summarized the "rule as was followed in [*Escude Cruz*]" this way: "so long as the agent has not participated in the alleged tort in the forum state, he is immune from suit on such tort both under general corporate law and under the state long-arm statute but if he has a "direct personal involvement" in a tort committed in the forum state, the agent is subject to jurisdiction in that state under its long-arm statute." *Id.* at 1064.

"After canvassing the reasoning of the various courts which have sought to provide a reasoned analysis of the question,"[9] the *Columbia Briargate* Court said that it was "persuaded" by what it termed a "rule adopted by [the Court]." *Id.* at 1064-65. The rule is expressed thus:

> [W]hen a non-resident corporate agent is sued for a tort committed by him in his corporate capacity in the forum state in which service is made upon him without the forum under the applicable state long-arm statute . . . , he is properly subject to the jurisdiction of the forum court, *provided the long-arm statute of the forum state is co-extensive with the full reach of due process.* On the other hand, if the claim against the corporate agent rests on nothing more than that he is an officer or employee of the non-resident corporation and if any connection he had with the commission of the tort occurred without the forum state, we agree that, under sound due process principles, the nexus between the corporate agent and the forum state is too tenuous to support jurisdiction over the agent personally by reason of service under the long-arm statute of the forum state.

*Id.* Having adopted the rule expressed above, the *Columbia Briargate* Court had no trouble concluding that the corporate agent involved in that case, the vice president of the bank, was subject to the jurisdiction of the forum court because "[h]e committed the alleged tort within the forum state." *Id.* at 1065. However, the Court noted that "[t]he result would be different"—

---

[9] The *Columbia Briargate* Court noted that "there are . . . district court decisions which may be said to be contrary to those cited by us." *Id.* at 1064 (citing *State Sec. Ins. Co. v. Frank B. Hall & Co., Inc.,* 530 F. Supp. 94 (N.D. Ill. 1981); *Bulova Watch Co,* 508 F. Supp. 1322; *Fashion Two Twenty, Inc. v. Steinberg*, 339 F. Supp. 836 (E.D.N.Y. 1971)). The Court distinguished these cases and did not rely on them.

meaning the vice president would not be subject to the jurisdiction of the forum court—"had [the vice president]'s connection with the tortious action been conducted without the forum state as was the situation in [*Escude Cruz*]." *Id.*

      b. Application of the *Columbia Briargate* rule. Upon a straightforward application of the rule adopted by the Fourth Circuit in *Columbia Briargate*, the court concludes that Aon would not be subject to the court's specific personal jurisdiction. The applicable portion of that rule is that "if the claim against the corporate agent rests on nothing more than that [it] is an officer or employee of the non-resident corporation and if any connection [it] had with the commission of the tort occurred without the forum state," then due process will not countenance the exercise of personal jurisdiction over the corporate agent. *Id.* Here, all the allegations made by U.S. Bank against Aon relate only to Aon's role as Redwood's corporate secretary, and neither Aon nor Redwood is domiciled in South Carolina. Thus, U.S. Bank's claims against Aon depend on the fact that Aon is a corporate agent of Redwood, a non-resident corporation. Aon's only connection to any torts that U.S. Bank alleges in its third-party complaint is that, as Redwood's corporate secretary, Aon, by placing three investment orders, directed U.S. Bank to purchase Destra UIT units and place them in the Redwood Trust Account. (*See* ECF No. 131 at 27-28; *see also* ECF No. 213 at 21 ("U.S. Bank has made [the required jurisdictional] showing: Aon itself issued and signed the Destra Investment Orders, pursuant to which the Targeted Income Units entered the trust account and allegedly harmed Companion.").) Each of these orders were executed by Aon in the Cayman Islands and were sent to U.S. Bank in Delaware. *See* ECF No. 171-2 at 43, 45, 48-49; *see also id.* at 4-5.) Thus, any connection Aon is alleged to have had with the commission of the alleged tort occurred outside South Carolina in the Camyan Islands or in Delaware. Aon then falls squarely under the part of the rule adopted in *Columbia Briargate* that does not permit a corporate

agent to be subject to a forum court's personal jurisdiction when the claim against the agent rests on the agent being an agent of an out-of-state corporation and when the only connection the agent has to the alleged tort occurred outside the forum.[10]

U.S. Bank does not appear to dispute that, under such a straightforward application of the rule as expressed in *Columbia Briargate*, Aon would be immune from personal jurisdiction in South Carolina. Instead, U.S. Bank has advanced two arguments for why a straightforward application of the rule is inappropriate. First, U.S. Bank argued at the motions hearing that the portion of the rule at issue here is dictum and thus need not be followed. The court agrees that, because it was not necessary in order to decide the case for the *Columbia Briargate* Court to reach the issue whether a court may exercise personal jurisdiction over an agent whose only connection to the tort at issue occurred outside the forum, the portion of the rule at issue here is dictum. *See Black's Law Dictionary* 1240 (10th ed. 2014) (defining dictum, a shortened version of *obiter dictum*, as "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)").

However, as Aon's counsel aptly stated at the motions hearing, "There's dictum, and then there's dictum." *See Stokes v. Consol. Wings Inv., LLC*, ___ F. Supp. 3d ___, 2016 WL 5650021, at *3 (S.D. Ind. Sept. 30, 2016) ("'[T]here is *dicta*, and then there is *dicta*—that is, not all *dicta* is created equal. Courts have long recognized in a variety of contexts that, in the absence of directly contradictory precedent, carefully considered *dicta* can have persuasive force.'" (quoting *Ind.*

---

[10] This conclusion is bolstered by the *Columbia Briargate* Court's treatment of the agent at issue in that case under hypothetical facts, namely that if the vice-president's "connection with the tortious action [had] been conducted without the forum state," the vice president could not have been subjected to the forum court's personal jurisdiction.

*Voluntary Firemen's Assoc. v. Pearson*, 700 F. Supp. 421, 442 (S.D. Ind. 1988)); *see also Kappos v. Hyatt*, ___ U.S. ___, 132 S. Ct. 1690, 1699 (2012) (noting that Supreme Court is less likely to ignore dicta that "carefully examined" the governing law, "surveyed the decisions" of other courts, and is "well-reasoned"); *Branch ex rel. Branch v. Coca-Cola Bottling Co. Consol.*, 83 F. Supp. 2d 631, 634-35 ("[A]s a general principle, 'a federal district court is required to give great weight to the pronouncements of its Court of Appeals, even though those pronouncements appear by way of dictum.'" (quoting *Max M. v. Thompson*, 585 F. Supp. 317, 324 (N.D. Ill. 1984))); *accord Patsy's Italian Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 209 & n.11 (E.D.N.Y. 2007) (collecting cases). The dictum of a superior tribunal generally should be followed if it is the result of thorough consideration of the issue and is intended as a guide for the future conduct of lower courts. *See United States v. Bell*, 542 F.2d 202, 206 (2d Cir. 1975) ("There is authority for the proposition that a distinction should be drawn between 'obiter dictum,' which constitutes an aside or an unnecessary extension of comments, and considered or 'judicial dictum' where the Court . . . is providing a . . . guide [for] the future conduct of inferior courts.").

Here, as the court has already mentioned, the rule adopted by the *Columbia Briargate* Court was the result of a thorough and painstaking assessment of the theories giving rise to the fiduciary shield doctrine in an effort to clarify the due process limitations on the exercise of a forum court's personal jurisdiction over the agent of an out-of-forum corporation. The Court's assessment produced a detailed survey of the Supreme Court's personal jurisdiction jurisprudence and of numerous cases in which a court's jurisdiction over an agent of an out-of-state corporation was evaluated under the fiduciary shield doctrine or related due process principles. *See Spring Indus.*, 923 F. Supp. at 825 (describing the opinion as "an in-depth analysis"); Lynn C. Tyler, *Personal Jurisdiction: Is It Time to Stick a Fork in the Fiduciary Shield Doctrine?*, 40 *Res Gestae* 9, 9 n.12

(1997) (directing readers to *Columbia Briargate* "[f]or a more complete history of the fiduciary shield doctrine"); Carlos R, Carrasquillo, Note, *The Fiduciary Shield Doctrine: A Rule of Statutory Construction or a Constitutional Principle?*, 9 J. Corp. L. 901, 913 (1984) (describing *Columbia Briargate* as "a thorough and persuasive analysis of the fiduciary shield doctrine"). Moreover, the Fourth Circuit described the rule as just that, a "rule" that it "adopted," language that connotes an intent to guide future decisions by lower courts.[11] In this regard, the court notes that the portion of the rule at issue in this case has been followed and used as an independent ground for dismissing a defendant for lack of personal jurisdiction in subsequent Fourth Circuit decisions, *see Bonney v. Roelle*, 117 F.3d 1413, at *8 (4th Cir. 1997) (unpublished table disposition); *Lewin v. Columbia Univ.*, 822 F.2d 55, *5 (4th Cir. 1987) (unpublished table disposition), and in district court cases, *see Fill v. MidCoast Fin., Inc.*, No. 1:12-cv-1054, 2012 WL 5879840, at *2-3 (E.D. Va. Nov. 20, 2012); *Harte-Hanks Direct Mktg./Balt., Inc. v. Varilease Tech. Fin. Grp., Inc.*, 299 F. Supp. 2d 505, 514 (D. Md. 2004); *Rich Food Servs., Inc. v. Rich Plan Corp.*, No. 5:99-cv-677-BR, 2001 WL 36210598, at *6 (E.D.N.C. May 12, 2001); *IAC Int'l, Inc. v. James*, No. 4:96cv27, 1996 WL 751454, at *3 (E.D. Va. June 21, 1996); *Holland v. Hay*, 840 F. Supp. 1091, 1098 (E.D. Va. 1994). Thus, because the rule stated in *Columbia Briargate* resulted from thorough well-reasoned consideration and appears to have been intended to guide, and has guided, courts in their

---

[11] *See Black's Law Dictionary* 1529 (10th ed. 2014) (defining "rule" as "an established and authoritative standard or principle; a general norm mandating or guiding conduct or action in a given type of situation"). *Black's Law Dictionary* does not provide a definition of "adopt" that is directly on point. The most relevant definition provided is in regard to "adoption" in parliamentary law, which is defined as the "act of agreeing to a[n] . . . order [or] rule . . . or of endorsing as [one's] own statement." *Id.* at 59; *see also Oxford English Dictionary* (defining "adopt," in relevant part as to "take up or start to use or follow," "take on or assume," or "formally approve or accept") https://premium.oxforddictionaries.com/us/definition/american_english/adopt (last accessed Nov. 10, 2016).

assessment of personal jurisdiction over agents of out-of-state corporations, the court declines to ignore it merely because it is dicta.

Second, aside from contending that the part of the *Columbia Briargate* rule at issue here is mere dicta, U.S. Bank also argues that subsequent interpretations of *Columbia Briargate* and subsequent cases demonstrate that more than the straightforward application of the rule as it is expressed above is required. U.S. Bank relies primarily on analysis in *Magic Toyota* and *Addy's Harbor Dodge v. Global Vehicles U.S.A. Inc.*, No. 4:11-cv-1065-RBH, 2014 WL 1779450 (D.S.C. May 5, 2014), for the proposition that, in certain circumstances, an agent of an out-of-state corporation whose only connection to the alleged tort occurred outside the state may yet be subject to the forum court's personal jurisdiction. (*See* ECF No. 213 at 21, 22 n.7.)[12] The court has located one other authority supporting the same proposition, *Bright Imperial Ltd. v. RT Media Solutions, S.R.O.*, No. 1:11-cv-935-LO-TRJ, 2012 WL 1831536 (E.D. Va. May 18, 2012). Addressing these cases, the court concludes that they do not persuasively explain why the court should forgo straightforward application of the *Columbia Briargate* rule.

In these cases, the district courts viewed the part of the *Columbia Briargate* rule at issue here as unclear. *See Bright Imperial*, 2012 WL 1831536, at *11 (noting that "[a]t first blush, it might appear that th[e] rule prevents the exercise of jurisdiction over [the corporate agent]," but concluding otherwise); *Magic Toyota*, 784 F. Supp. at 315 ("Less clear from *Columbia Briargate* is whether an individual defendant may also be subject to jurisdiction if he does not commit the

---

[12] U.S. Bank also cites to *Eplus Technology, Inc. v. Aboud*, 313 F.3d 166 (4th Cir. 2002), *Blue Mako, Inc. v. Minidis*, 472 F. Supp. 2d 690 (M.D.N.C. 2007), and *National Utility Review, LLC v. Hunter Management L.L.C.*, 2011 WL 4625755 (M.D.N.C. June 27, 2011). (*See* ECF No. 213 at 21-22.) The court concludes that these cases are inapposite because each of them involves a corporate agent who committed the alleged tort in the forum state.

wrong in the forum state but has reason to foresee responsibility in the forum state for wrongful acts committed outside the forum state.").[13] First, they noted that the Fourth Circuit did not need to reach a determination regarding personal jurisdiction when the corporate agent's actions occur outside the forum state. *See Addy's Harbor Dodge*, 2014 WL 1779450, at * 5; *Bright Imperial*, 2012 WL 1831536, at *10; *Magic Toyota*, 784 F. Supp. at 315 (noting that the *Columbia Briargate* court merely "gave some guidance on the issue"). By doing so, the cases suggest *sub silentio* that this part of the rule has less persuasive force because it is dictum. Second, one of the cases perceives some uncertainty in the language employed by the Fourth Circuit, emphasizing that the claim must rest on "'*nothing more*'" than that the corporate agent "'is an officer or employee of the non-resident corporation.'" *Bright Imperial*, 2012 WL 1831536, at * 11 (quoting *Columbia Briargate*, 713 F.2d at 1064).[14] Third, the cases note that the *Columbia Briargate* court viewed the

---

[13] Although the *Addy's Harbor Dodge* court followed the *Magic Toyota* analysis and found that *Columbia Briargate* did not clearly hold that out-of-state corporate agents whose only activities connecting them to the alleged tort occurred outside the forum were not subject to personal jurisdiction, *see* 2014 WL 1779450, at * 5-6, the court misstated the *Columbia Briargate* rule. It stated that the rule the Fourth Circuit arrived at was that "'so long as the agent has not participated in the alleged tort in the forum state, he is immune from suit on such tort both under general corporate law and under the state long-arm statute but *if he has a "direct personal involvement" in a tort committed in the forum state, the agent is subject to jurisdiction in that state* under its long-arm statute.'" *Id.* at *5 (quoting *Columbia Briargate*, 713 F.2d at 1064). However, this is the Fourth Circuit's characterization of the rule set forth in *Escude Cruz*; it is *not* the rule adopted by the Fourth Circuit. *Compare Columbia Briargate*, 713 F.2d at 1064 (describing *Escude Cruz* rule), *with id.* at 1064-65 (describing rule adopted by Fourth Circuit). Under the rule that was expressly adopted by the Fourth Circuit after reviewing at length not only *Escude Cruz* but numerous other cases that formulated similar but not identical rules, "if the claim against the corporate agent rests on nothing more than that he is an officer or employee of the non-resident corporation and if any connection he had with the commission of the tort occurred without the forum state, we agree that, under sound due process principles, the nexus between the corporate agent and the forum state is too tenuous to support jurisdiction over the agent personally." *Id.* at 1064-65.

[14] As previously noted, *Addy's Harbor Dodge* referred to the wrong rule and, thus, did not address the language used by the Fourth Circuit in the rule that it actually adopted. *See supra* note 13. The court also notes that *Magic Toyota* did not state the rule adopted by the Fourth Circuit and,

decisions in *Idaho Potato* and *Escude Cruz* with favor and, thus, interpret the rule adopted by the Fourth Circuit as importing the tests for personal jurisdiction over an out-of-state corporate agent from those cases. *See Bright Imperial*, 2012 WL 1831563, at *10 (noting that "[t]he Fourth Circuit found persuasive the reasoning in the *Idaho Potato* opinion" and that "the Fourth Circuit also found that the *Idaho Potato* opinion was consistent with *Escude Cruz*"); *Magic Toyota*, 784 F. Supp. at 314 n.14, 315 (noting that the Fourth Circuit favorably quoted from *Idaho Potato* and *Escude Cruz*); *see also Addy's Harbor Dodge*, 2014 WL 1779540, at * 5-6 (replicating *Magic Toyota*'s analysis importing rules from *Idaho Potato* and *Escude Cruz*). Accordingly, the cases, applied the following test from *Idaho Potato* and *Escude Cruz* to which the Fourth Circuit referred in *Columbia Briargate*: agents who sued solely in their capacity as agents of an out-of-state corporation and whose only connection with the alleged tort occurred outside the forum state may be subject to personal jurisdiction of the forum court if there is "'some showing of direct, personal involvement by the corporate [agent] in some decision or action, which is causally related to the plaintiff's injury,'" which "typically exists 'where the defendant agent is the guiding spirit behind the wrongful conduct, or the central figure in the challenged corporate activity.'" *Magic Toyota*, 784 F. Supp. at 315 (brackets omitted) (quoting *Escude Cruz*, 619 F.2d at 902, 907); *accord Addy's Harbor Dodge*, 2014 WL 1779450, at 5-6; *Bright Imperial*, 2012 WL 1831536, at *11-12. Fourth, two of the cases conclude that permitting an out-of-state corporate agent to evade personal jurisdiction merely because its connections to the alleged tort occurred outside the forum would be unreasonable. *See Bright Imperial*, 2012 WL 18311536, at *12 ("[I]t would offend substantial justice to permit an individual, who so clearly causes harm in this forum, to avoid accountability

---

likewise, did not address the language used by the Fourth Circuit to describe the rule it adopted. *See Magic Toyota*, 784 F. Supp. at 314-15.

here simply because he conducted his affairs abroad . . . , and it would be illogical to permit jurisdiction over a corporation for a tortious act committed abroad but which caused harm here, and at the same time allow the individual allegedly responsible for each of the injurious decisions to escape the grasps of this Court's judicial authority."); *Magic Toyota*, 784 F. Supp. at 315 ("It is inconceivable that a corporate employee who cleverly refrains from committing tortious acts in the forum state can evade being haled into court there, while a less savvy employee, who commits the acts in the forum state, may be haled into court there, where both employees are acting on behalf of their employers with the purpose of injuring the plaintiff residing in the forum state.")

This court questions the reasoning behind *Addy's Harbor Dodge*'s, *Bright Imperial*'s, and *Magic Toyota*'s interpretation of the rule adopted by the Fourth Circuit in *Columbia Briargate*. First, as discussed above, this court does not believe that the persuasiveness of the part of the rule at issue here is significantly diminished merely because discussion of the issue by the Fourth Circuit was unnecessary to dispose of the case before it. Second, with deep respect to the contrary opinion of other jurists, this court does not believe that the rule expressed by the Fourth Circuit is unclear. Whatever uncertainty arises from the Fourth Circuit's use of "nothing more" in the rule it adopted,[15] it should not raise any doubt that the rule prevents the exercise of jurisdiction over an

---

[15] In this court's view, the "nothing more" language was employed to signify that the rule applies when the agent is sued in his capacity as an agent and not when he is sued in a capacity divorced from the agency relationship. This court does not believe that the language is intended to distinguish between an agent who has a weak connection to the underlying tort and is therefore not amenable to personal jurisdiction and an agent who has a strong connection to the underlying tort and therefore is amenable to personal jurisdiction. This belief is strengthened by subsequent language in the rule that prevents personal jurisdiction when "*any connection* [the corporate agent] had with the commission of the tort occurred without the forum." *Columbia Briargate*, 713 F.2d at 1064 (emphasis added). It is noteworthy that the *Columbia Briargate* Court from the outset "assumed to be true" allegations that the vice president at issue in that case himself had "made, or induced others to make, a number of false and fraudulent representations," which resulted in "substantial damages" to the plaintiff. *Id.* at 1054.

out-of-state corporate agent when his only connection to the tort occurs outside the state. In applying the very rule it had just adopted, the *Columbia Briargate* Court stated that there was "no question" that the vice president in that case was amenable to jurisdiction precisely because "[h]e committed the alleged tort within the forum state" and that "the result would be different"—the vice president, whose connection to the underlying tort appeared quite strong, would not be amenable to jurisdiction—if the vice president's "connection with the tortious activity [had] been conducted without the forum state." *Columbia Briargate*, 713 F.2d at 1065. The clarity of the Fourth Circuit's distinction between activity within the forum and activity outside the forum is the reason that many cases applying the *Columbia Briargate* rule have found jurisdiction lacking simply because the corporate agent's conduct was not alleged or shown to have occurred inside the forum. *See Bonney*, 117 F.3d 1413; *Lewin*, 822 F.2d 55; *Fill*, 2012 WL 5879840; *Harte-Hanks*, 299 F. Supp. 2d 505; *Rich Food*, 2001 WL 36210598; *IAC Int'l*, 1996 WL 751454; *Holland*, 840 F. Supp. 1091. Third, unlike the *Addy's Harbor Dodge*, *Bright Imperial*, and *Magic Toyota* courts, this court declines to equate the rules expressed in *Idaho Potato* and *Escude Cruz* with the rule expressed by the Fourth Circuit in *Columbia Briargate*. As should be clear from the discussion of the *Columbia Briargate* decision above, its treatment of the *Idaho Potato* and *Escude Cruz* opinions was a part of a larger canvassing of the case law addressing when a corporation may be amenable to jurisdiction and its agents may not be. The rulings of other courts that are conveyed during such a canvassing should not be confused with the Court's own ruling. It would be strange if, by merely canvassing the extant authorities and citing some more favorably than others, the express rule adopted by a court could be usurped by the expressions of the authorities favorably cited. It would be stranger still for the Fourth Circuit to have intended to adopt a rule in all points equal to that created by another court but, when it came to expressing the rule it adopted, to have

stated it in such a way that "at first blush" it operates much differently than the other court's rule. Having set forth its understanding of the *Idaho Potato* and *Escude Cruz* rules, the Fourth Circuit could not have been unaware that the rule it adopted was not on all fours with the rules expressed in those cases; in fact, the facial dissimilarity between the rule adopted in *Columbia Briargate* from the rules expressed in *Idaho Potato* and *Escude Cruz* should caution against bootstrapping the latter into the former.[16] Fourth, this court does not believe that it is unreasonable to conclude that an out-of-state corporate agent is not subject to personal jurisdiction solely because its connections to the alleged tort occurred outside the forum. The court notes that the *Bright Imperial* and *Magic Toyota* decisions cite to no authority in reaching a contrary conclusion, *see Bright Imperial*, 2012 WL 1831536, at *12; *Magic Toyota*, 784 F. Supp. at 315, and, as much as the court respects the opinions of the jurists authoring those decisions, the court cannot accept their conclusions when they appear contrary to the Fourth Circuit's conclusion in *Columbia Briargate*. For, if nothing else, *Columbia Briargate* clearly stands for at least two clear propositions: (1) *ceteris paribus*, the minimum contacts analysis applied to a corporation should be different than the minimum contacts analysis applied to that corporation's agent, and (2) *ceteris paribus*, the minimum contacts analysis applied to a corporate agent whose conduct connecting him to the tort occurred within the forum should be different than the minimum contacts analysis applied to a

---

[16] Even assuming that the Fourth Circuit intended to adopt the same rule as expressed in *Idaho Potato*, it is important to recall the Fourth Circuit's characterization of that rule: "In essence, what the court in *Idaho Potato* held was that when the corporate agent has not committed a tort in the forum state his foreseeable 'contacts' with that state are too tenuous to establish those 'minimum contacts' essential for jurisdiction." *Columbia Briargate*, 713 F.2d at 1061. Thus, as the Fourth Circuit understood *Idaho Potato*, the fact that the corporate agent did not commit a tort in the forum makes his foreseeable contacts with the forum too tenuous and, thus, the only relevant question is whether the agent's tortious activity was within or without the forum state. *Bright Imperial* turns this analysis on its head, asking, after concluding that any connection to the tort occurred outside the forum, whether there was yet sufficient foreseeable contacts meriting personal jurisdiction. *Bright Imperial*, 2012 WL 1831536, at *11-12.

corporate agent whose conduct connecting him to the tort occurred only outside the forum. This court declines to interpret *Columbia Briargate*'s rule in a way that is based on contrary propositions, and thus it cannot agree with *Bright Imperial* and *Magic Toyota* in this regard.

In sum, the court disagrees with U.S. Bank's arguments that the *Columbia Briargate* rule may be ignored as dicta and that the court should follow the interpretations of that rule in *Addy's Harbor Dodge*, *Bright Imperial*, and *Magic Toyota*. Under a straightforward application of the *Columbia Briargate* rule, Aon is not subject to the court's personal jurisdiction.

c. Application of alternative rule. Even assuming that the court should apply the *Columbia Briargate* rule in the manner advanced by U.S. Bank, this court would still conclude that Aon is not subject to the court's personal jurisdiction. Relying on *Addy's Harbor Dodge* and *Magic Toyota*, among other cases, U.S. Bank contends that, for Aon to be subject to personal jurisdiction, "'[w]hat is required is some showing of direct, personal involvement by the corporate officer in some decision or action which is causally related to the plaintiff's injury.'" (ECF No. 213 at 21 (quoting *Magic Toyota*, 784 F. Supp. at 315).) As Aon points out, however, under the *Magic Toyota* version of the rule, the requisite "'direct personal involvement typically exists where the defendant agent is the guiding spirit behind the wrongful conduct, or the central figure in the challenged corporate activity.'" (ECF No. 216 at 9 (internal quotation marks and brackets omitted) (quoting *Magic Toyota*, 784 F. Supp. at 315).) In their briefs and at the motions hearing, the parties disputed whether the rule required U.S. Bank to show that Aon was the guiding spirit or central figure behind the wrongful conduct or, instead, to show only that Aon had direct personal involvement in an action causally connected to U.S. Bank's alleged injury. The court declines to resolve this dispute as, under either version of the rule, U.S. Bank has not met its burden.

Assuming, on one hand, that Aon's version of the rule is correct and U.S. Bank must show that Aon was the guiding spirit behind the alleged torts or the central figure in the decision to place Destra UIT units into the Redwood Trust Account, the court has no trouble concluding that U.S. Bank has failed to meet its burden. U.S. Bank does not seriously contend that Aon played the role of guiding spirit or central figure in Redwood's alleged tortious conduct; rather, as Aon persuasively argued, U.S. Banks' pleadings consistently have alleged that Burns, not Aon, played this role. (*See, e.g.*, ECF No. 131 at 4-5, 13-14, 35.)

Assuming, on the other hand, that U.S. Bank's version of the rule is correct and U.S. Bank need show only that Aon had direct personal involvement in decisions leading to the injury caused by the placing of Destra UIT units into the Redwood Trust Account, the court would still conclude that U.S. Bank has not met its burden. The *Magic Toyota* court explained that the type of direct personal involvement required typically is met when the corporate agent is the guiding spirit or central figure. *Magic Toyota*, 784 F. Supp. at 315. Although, as U.S. Bank asserts, the qualifier "typically" leaves room for jurisdiction where the agent is not the guiding spirit or central figure, *see also Addy's Harbor Dodge*, 2014 WL 1779450, at *7 (stating *Magic Toyota* test as requiring plaintiff to "establish that there was . . . 'direct, personal involvement' by [corporate agents] . . . *or* that they were 'the guiding spirits . . . or the central figures'" (emphasis added) (internal quotation marks omitted) (quoting *Magic Toyota*, 784 F. Supp. at 315)), the *Magic Toyota* court still required more than just any causal connection. Specifically, for a corporate agent to be "amenable to suit in th[e] forum," the *Magic Toyota* court required the "[a]gent . . . take[] personal and calculated action against a plaintiff in a particular forum, fully conscious of the consequences of his actions." *Magic Toyota*, 784 F. Supp. at 315; *accord Addy's Harbor Dodge*, 2014 WL 1779450, at *5; *see also Income Tax Sch., Inc. v. Lopez*, No. 3:12-cv-334, 2002 WL 3249547, at

42

*11 (E.D. Va. Aug. 7, 2012) ("Merely causing a tortious injury in the forum state, however, is insufficient for a court to assert personal jurisdiction. Rather the non-resident defendant must "know that that conduct would cause harm to a forum resident" (quoting *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 398 (4th Cir. 2003))).

This requirement appears to be in accord with *Escude Cruz*, the case on which the *Magic Toyota* court relied in formulating its version of the rule. In *Escude Cruz*, the First Circuit equated a corporate agent's amenability to personal jurisdiction with the agent's tort lability under the substantive law. *See Escude Cruz*, 619 F.2d at 907. Because, as a "general rule, . . . an officer of a corporation is liable for torts in which he personally participated," personal jurisdiction "require[s] . . . some showing of direct personal involvement by the corporate officers in some decision or action which is causally related to plaintiff's injury." *Id.* The *Escude Cruz* court then offered a "more thorough statement[] of the general rule[:]"

> It is the general rule that if an officer or agent of a corporation directs or participates actively in the commission of a tortious act or an act from which a tort necessarily follows or may reasonably be expected to follow, he is personally liable to a third person for injuries proximately resulting therefrom. But merely being an officer or agent of a corporation does not render one personally liable for a tortious act of the corporation. Specific direction or sanction of, or active participation or cooperation in, a positively wrongful act of commission or omission which operates to the injury or prejudice of the complaining party is necessary to generate individual liability in damages of an officer or agent of a corporation for the tort of the corporation.

*Id.* (quoting *Lobato v. Pay Less Drug Stores*, 261 F.2d 406, 408-09 (10th Cir. 1958)).

Here, U.S. Bank alleges that Aon signed three investment orders in its capacity as Redwood's corporate secretary, resulting in the substitution of Destra UIT units in the Redwood Trust Account. (*See* ECF No. 131 at 27-28; ECF No. 213 at 21.) Further, as the court previously explained, the evidence adduced shows that Aon signed the orders in the Cayman Islands and sent them to U.S. Bank in Delaware, which made the substitution from one Delaware account into

43

another Delaware account. Thus, aside from merely conclusory allegations, there is nothing in the third-party complaint or evidence on record from which the court might infer that Aon took a personal, calculated action against Companion in South Carolina, fully conscious that its actions would cause Companion harm. Nothing shows that Aon took calculated, rather than merely ministerial, actions, let alone that such actions were directed at Companion in South Carolina, rather than at U.S. Bank in Delaware, and nothing shows that Aon was conscious that its actions would cause harm, let alone that it was conscious that it would cause harm in South Carolina specifically. In the court's estimation, this is not enough even under the version of the rule set forth by *Magic Toyota*.

In sum, because U.S. Bank has failed to meet its burden to demonstrate that Aon should be subject to this court's specific personal jurisdiction, the court must dismiss U.S. Bank's amended third-party complaint as to Aon for lack of personal jurisdiction, pursuant to Rule 12(b)(2). The court declines to consider Aon's alternative ground for dismissal that U.S. Bank's third-party complaint seeking contribution fails to state a claim for which the court could grant relief, pursuant to Rule 12(b)(6).

## IV. CONCLUSION

For the foregoing reasons, pursuant to Rule 12(b)(2), USBT's motion to dismiss Burns' fourth-party complaint against it for lack of personal jurisdiction (ECF No. 192) is **GRANTED**, and Aon's motion to dismiss U.S. Bank's amended third-party complaint as to it for lack of personal jurisdiction (ECF No. 171) is also **GRANTED**. Burns' fourth party complaint (ECF No.

143) is **DISMISSED**,[17] and U.S. Bank's amended third-party complaint (ECF No. 131) is

**DISMISSED** as to Aon.

       **IT IS SO ORDERED**.

*J. Michelle Childs*

United States District Judge

November 16, 2016
Columbia, South Carolina

---

[17] In response to the motion to dismiss his fourth-party complaint, Burns requests, in the event the court concludes that it lacks personal jurisdiction over USBT, that the court transfer the action to the U.S. District Court for the District of Delaware. (ECF No. 219 at 16.) Such a request must be made pursuant to 28 U.S.C. § 1631, which permits transfers when a district court determines that (1) there is a want of jurisdiction in the transferor court; (2) the transferee court is one in which the action could have been brought at the time it was filed in the transferor court; and (3) the transfer would be in the interests of justice. *See Dragenice v. Ridge*, 389 F.3d 92, 94 (4th Cir. 2004); *McCook Metals LLC v. Alcoa, Inc.*, 249 F.3d 330, 334 (4th Cir. 2001). The court declines to transfer the action. First, although it is not clear whether § 1631 permits a transfer based on a lack of personal rather than subject-matter jurisdiction, *see In re Carefirst of Md.*, 305 F.3d 253, 257 n.2 (4th Cir. 2002) (noting circuit split and declining to resolve issue), "the better view is that [§] 1631 is limited to subject matter jurisdiction defects and does not address problems with personal jurisdiction," 15 Charles Alan Wright, et al., *Federal Practice and Procedure* § 3842 (4th ed. 2013). Because the court concludes that it lacks personal jurisdiction over USBT, § 1631 is inapposite. Second, even assuming that § 1631 were an appropriate vehicle for transfer occasioned by lack of personal jurisdiction, the court would not exercise its discretion to do so. *See id.* ("Section 1631 . . . gives the court discretion to transfer or to dismiss without prejudice.") The court notes that Burns did not file a separate motion to transfer and, in his response, did not cite § 1631 or provide any reasons that transfer would be appropriate. Moreover, the court notes that, under South Carolina law—upon which Burns' contribution claim is based (*see* ECF No. 143 at 10)—Burns suffers no more prejudice by filing a new complaint in the District of Delaware than he would suffer by being deemed to have filed the complaint there at the time he brought the action in this court, *see* S.C. Code Ann. §§ 15-3-530, -38-40(D) (2015).